UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREA ROSE OWENS,

                Plaintiff,          Civil Action No. 18-12704
                                  Honorable Thomas L. Ludington
     v.                         Magistrate Judge David R. Grand

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 16]**

Plaintiff Andrea Rose Owens ("Owens") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions (Docs. #15, #16), which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

**I.      RECOMMENDATION**

For the reasons set forth below, this Court finds that the Administrative Law Judge's ("ALJ") conclusion that Owens was not disabled under the Act is not supported by substantial evidence. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment (**Doc. #16**) be **DENIED**, Owens's Motion for Summary Judgment (**Doc. #15**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

## II.    REPORT

### A.    Background

Owens was twenty-nine-years old at the time of her alleged onset date of May 1, 2008 (Tr. 154), and at 5'3" tall weighed approximately 150 pounds during the relevant time-period. (Tr. 256).  She completed high school but had no further education.  (Tr. 154).  She has no prior work history besides child care out of her own home.  (Tr. 39).  Despite identifying May 1, 2008 as her alleged onset date, Owens indicated that she "stopped working" on November 1, 2012, though this relates to a cashier job she held for only a few months.  (Tr. 174, 190).  She now alleges disability primarily because of lumbar degenerative disc disease status post lumbar discectomy; migraines; and depression.  (Tr. 17).

After the Social Security Administration denied Owens's application for SSI at the initial level (Tr. 7) and on reconsideration (Tr. 78-94), she timely requested an administrative hearing, which was held on November 28, 2017, before ALJ Therese Tobin (Tr. 35-54).  Owens, who was represented by attorney Jason Mohler, testified at the hearing, as did vocational expert Diane Regan.  (*Id.*).  On January 31, 2018, the ALJ issued an unfavorable written decision.  (Tr. 12-26).  On June 29, 2018, the Appeals Council denied review.  (Tr. 1-6).  Owens timely filed for judicial review of the final decision on August 29, 2018.  (Doc. #1).

### B.    Medical History

On January 3, 2014, Owens had an MRI of her back.  (Tr. 298).  The MRI revealed a host of issues, including "a left paracentral and foraminal annular fissure disc protrusion compressing the left L5 nerve root and abutting against the exiting left L4 nerve root."  (Tr. 299).  It also revealed "a bulging disc and small central disc protrusion and annular fissure [at L5/S1] mildly compressing the thecal sac and contacting the left S1 nerve root."  (*Id.*).  This was consistent with an older study of Owens's back.  (*Id.*).  Lastly, it revealed a "[n]ew small right paracentral

2

disc protrusion at L2/L3 mildly contacting the right L3 nerve root and a new mildly bulging disc at L3/L4." (*Id*.).

Owens saw Dr. Laurey Hanselman, D.O., a consulting physician working with Dr. Joanna Kala, D.O., on May 22, 2014. (Tr. 292-95). At that time, Dr. Hanselman suggested skilled physical therapy and pain management. (Tr. 295). The records indicate that Owens did not commit to skilled physical therapy at that time. (Tr. 283-91). Owens saw Dr. Hanselman again on December 23, 2014. (Tr. 283-85). At that point, she was walking with a limp. (Tr. 285). Dr. Hanselman ordered intense skilled physical therapy and an updated MRI. (*Id*.). She also referred Owens for a surgical consult and/or epidural injections to the lumbrosacral region. (*Id*.). Owens received a Toradol injection on December 11, 2014, which was unsuccessful in alleviating her pain. (Tr. 34-42; Tr. 278-82).

Owens attempted to get a surgical consult but was unable to do so before she returned to Dr. Hanselman on March 10, 2015. (Tr. 278-82). At that point, she had "quite severe pain in the lumbosacral region." (Tr. 278). She had a positive left straight leg test, and a limp secondary to back pain. (Tr. 280). Dr. Hanselman continued her on Norco and indicated she would wait for the surgical consult before making further recommendations. (*Id*.).

Owens had a surgical consult with Dr. Peter Grain, M.D. on March 27, 2015. (Tr. 275-77). At that point, he recommended L5 laminectomy and L5/S1 discectomy. (Tr. 276). Owens' condition continued to worsen and she continued to treat with Dr. Hanselman and Dr. Kala. (Tr. 265-74). She had a positive straight leg test "while seated" and tried another epidural steroid injection on May 23, 2015. (Tr. 272-73). Again, the injection did not provide any relief. (Tr. 271).

Owens saw Dr. Gerald R. Schell, MD for another surgical consult on June 10, 2015.  (Tr. 325-27).  Dr. Schell reported that her Achilles reflexes were zero on the left side, and Owens walked "with substantial left antalgic gait."  (Tr. 326).  She also had a positive straight leg raise test at about 45 degrees.  (Tr. 326).  He stated: "she has a large free fragment disc with severe left radiculopathy, which has been present for [six] months."  (*Id*.).  He recommended surgical decompression.  (*Id*.).

Owens decided to proceed with surgery and was admitted to the hospital on July 6, 2015.  (Tr. 322-24).  After the surgery, Owens's right leg pain improved initially.  (Tr. 320; Tr. 316-18).  At a follow-up appointment with Dr. Kala, Dr. Kala noted that her lumbosacral pain was slightly improved, but there was "left calf pain with hyperesthesia of the left Achilles tendon."  (Tr. 317).  Dr. Kala suspected an "L5-S1 nerve irritation."  (*Id*).

Owens had another MRI on December 18, 2015.  (Tr. 312-13).  This MRI revealed a "[m]ild to moderate broad-based central protrusion at the L5/S1 level."  (*Id*).  It also revealed "an annular tear at the L4/L5 level" with slight contact of the L4 nerve root and L5 nerve root.  (*Id*.).  Owens was unable to tolerate an EMG except as to the left sensory sural nerve.  (*Id*.).  Dr. Kala ordered Owens to follow-up with Dr. Schell regarding her previous surgery and whether further surgery would be necessary.  (Tr. 311).

Owens saw Dr. Kala again on December 21, 2015.  (Tr. 309-11).  At that point, Owens's pain in her left Achilles tendon and left foot was getting worse.  (*Id*.).  Owens reported difficulty wearing shoes and walking.  (Tr. 310).

On her January 6, 2016 visit, she "had recurrence of the pain with numbness and paresthesia."  (Tr. 319).  She also had another positive straight leg test and "sensory changes in

an S1 distribution." (*Id*.). Dr. Schell ordered a CT myelogram to determine if another surgery was necessary. (*Id*).

The CT myelogram revealed "some mild to moderate disc space narrowing at L5-S1." (Tr. 381-84). It also revealed "mild disc bulging at L4-L5." (Tr. 382). Dr. Schell reviewed these results and concluded that Owens needed physical therapy and time to let her back heal. (*Id*.).

Owens had another CT myelogram on April 13, 2016. (Tr. 394-95). After this CT, she returned to Dr. Schell, presenting with a mildly antalgic gait. (Tr. 471). Dr. Schell wrote that he believed that Owens had "a problem with severe degenerative disc pathology and some post laminectomy changes at L5-S1." (*Id*.). This included "mild disc bulging and foraminal stenosis . . . [and] disc space collapse . . ." (*Id*.). He stated that he still wanted to give it more time and physical therapy, but if that did not work "she might require a lumbar fusion at the lumbosacral junction." (*Id*.).

Owens returned to Dr. Kala after another CT myelogram on June 13, 2016. (422-24). She told Dr. Kala that "she [was] really skeptical about having any [further] surgical intervention, but at the same time" she was in a lot of pain. (Tr. 422). Upon physical examination, Owens's motor function at the left lower extremity was diminished. (Tr. 423). In addition, her reflexes at her left patella and left Achilles were absent. (*Id*.). Owens had extreme pain upon her straight leg test. (*Id*.). Dr. Kala recommended a neurosurgical evaluation for repair of radiculopathy because she wanted Owens weaned off her pain medication. (Tr. 424).

Owens visited Dr. Kala again on June 29, 2016. (Tr. 425). Dr. Kala wrote a detailed history about Owens's struggles with back pain:

> Andrea Owens is a 37-year-old Caucasian female who is being seen in neurological evaluation in regards to lumbosacral pain. Patient has had

> many-year history of having lumbosacral pain.  Initially, her symptoms
> started prior to 2005.  She has had lumbosacral pain with pain radiating
> down the left lower extremity.  We have had an MRI of the lumbosacral
> spine back from 02/06/2005, which revealed degenerative disk disease,
> L5-S1, and pain radiating down the left lower extremity at that time.  In
> 2015, she developed quite severe pain with numbness and tingling
> radiating down the left lower extremity.  She underwent lumbar
> laminectomy with Dr. Schell in July of 2015.  After surgical intervention,
> she experienced more pain, severe pain radiating down the left lower
> extremity with numbness and tingling sensation of the left lower extremity
> and quite severe lumbosacral pain.  Patient states that on June 15th she was
> cleaning her carpet, she was on her hands and knees bending over and she
> states within hours she developed more intense lumbosacral pain with pain
> more so now on the right side than the left.

(Tr. 425-26).

Dr. Kala also performed a physical examination, finding that Owens had "quite significant paint on palpation of the lumbosacral region" and "pain in bilateral sacroiliac joints . . ." (Tr. 427). Dr. Kala noted that "[s]traight leg raising causes pain at 90° on the right side and less than 90° on the left side.  This causes pain in the lumbosacral region that radiates into the buttock and slightly into the thigh." (*Id.*).  Although Owens could ambulate without difficulty, she did so with a slight antalgic gait. (Tr. 428).  Dr. Kala noted that Owens was taking 600 mg of gabapentin three times a day for nerve pain and Flexeril at night. (*Id.*).  Dr. Kala also noted that Owens was taking "opiate medication" – Norco 10/325 – and that she was going to be started on "Medrol Dosepak." (Tr. 429).

At this time, Dr. Kala completed a physical assessment for disability, which is discussed further below. (Tr. 396-97).  Owens had two more MRIs on September 2, 2016 and December 12, 2016. (Tr. 443-46).  The December MRI revealed that post-operative changes were present. (Tr. 443).  Specifically, Owens showed "a persistent central disc protrusion at L5-S1 resulting in stenosis . . . traversing S1nerve roots." (*Id.*).  Owens also had mild canal narrowing. (*Id.*).  She also had a "disc protrusion at L4-L5 with an annular tear resulting in mild narrowing of the left

lateral recess, contacting the traversing left L5 nerve root and resulting in moderate left neural foraminal narrowing." (*Id*.). Lastly, she had a "disc protrusion at L3-L4 contacting the exiting right L3 nerve root." (*Id*.).

On March 25, 2017, Dr. Kala referred Owens for a neurosurgical consult at the University of Michigan. (Tr. 460). Before going to the University of Michigan, Owens consulted Dr. Schell another time on July 2, 2017. (Tr. 462-65). At this point, he acknowledged that she had "severe pain in the tailbone and buttock area" that had not responded to physical therapy or injections. (Tr. 462). He suggested a lumbar spinal fusion. (*Id*.).

The records indicate that Owens went to the University of Michigan for her surgical evaluation on August 8, 2017. (Tr. 586-601). At that time Nurse Practitioner Megan Curtis and Dr. Szerlip offered Owens an L5-S1 bilateral laminectomy and discectomy. (Tr. 590). Nurse Practitioner Curtis noted that Dr. Szerlip "discussed the surgery with the patient face to face," and explained:

> [T]he goal of the surgery would be to improve her leg pain, but not necessarily her back pain. She is aware that given her previous surgery she has [an] increased risk for a CSF leak, and inability to relieve her pain. She would like to think about surgical intervention and contact us if she would like to proceed.

(Tr. 590; ALJ Ex. 19F).

It appears from the record that Owens decided to go ahead with the surgery at the University of Michigan, but there are no records indicating the results. (Tr. 602-670).

**C.    Opinion Evidence**

Dr. Kala completed a physical assessment of Owens on June 29, 2016.  (Tr. 396-97).[1]  At this point, Dr. Kala had been treating Owens since at least May 22, 2014.  (Tr. 256).  Dr. Kala had records on Owens up through and beyond her laminectomy with Dr. Schell in July of 2015.  (Tr. 425-26).  One question in the assessment asked Dr. Kala to "indicate the total number of hours [Owens] can sit and stand/walk in an 8-hour workday."  (Tr. 396).  Dr. Kala responded "5-10 min" as to both.  (*Id.*).  However, in the very next section, Dr. Kala stated that Owens would need to take unscheduled breaks of ten to fifteen minutes every one to two hours depending on her activity level.  (*Id.*).  Dr. Kala also stated that Owens would likely be absent from work more than four times a month because of her back pain or treatment for back pain.  (Tr. 397).

Dr. Eric VanderHaagen, D.O. completed an opinion for the State agency on June 7, 2016.  (Tr.  61).  He did not assess Owens but reviewed her medical records from October 29, 2015 through April 18, 2016.  (Tr. 61-74).  He stated that Owens's claims regarding the "intensity, persistence, and functionally limiting effects of the symptoms" were not substantiated by the medical evidence alone.  (Tr. 68).  He found that Owens would have exertional limitations but could stand and/or walk for a total of two hours every day.  (Tr. 69).  In addition, he stated that she could sit for about six hours in an eight-hour workday.  (*Id.*).

### D.    Owen's Hearing Testimony

Owens testified that she had trouble standing, walking, sitting, bending over, and picking things up due to her back.  (Tr. 39).  Although she was able to drive to the hearing in Detroit, she testified that she has difficulty with attending to personal needs such as showering, needs help to do basic chores around the house, and that her pain ranged from a six out of ten on a good day to

---

[1]  Dr. Kala also did a Mental Capacity Assessment on June 29, 2016, but since Owens does not contest the ALJ's finding on mental capacity, this Court will focus on her physical impairments.  (Doc. #15).

an eight out of ten on a bad day.  (Tr. 43-45, 49-50).  She has about ten bad days a month.  (Tr. 70).

### E.    The ALJ's Application of the Disability Framework Analysis

Under the Act, DIB and SSI are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  Notably, at step four, if the claimant cannot perform her past relevant work,

or has no past relevant work, the ALJ determines the claimant's residual functional capacity ("RFC") to perform any work in the national or local economy before moving to step five. *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012).  "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Owens was not disabled under the Act.  (Tr. 12-27).  At Step One, the ALJ found that Owens had not engaged in substantial gainful activity since October 14, 2015.  (Tr. 17).  At Step Two, the ALJ found that she had the following severe impairments: "lumbar degenerative disc disease status post lumbar discectomy; migraines; and depression."  (Tr. 17-18).  At Step Three, the ALJ found that Owens's impairments, whether considered alone or in combination, did not meet or medically equal a listed impairment.  (Tr. 15-16).

The ALJ then assessed Owens's RFC, concluding that she could perform sedentary work with the following accommodations:  "a sit stand option permitting change in position if needed and without disturbing the work place; can occasionally climb ramps and stairs, but never climb ladders, ropes and scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can never be exposed to unprotected heights or moving mechanical parts; and is limited to simple, routine tasks involving simple work-related decisions and simple work place changes."  (Tr. 20).

At Step Four, the ALJ found that Owens had no past relevant work.  (Tr. 25).  At Step Five, the ALJ determined, based in part on testimony provided by the vocational expert in response to hypothetical questions, that Owens could perform the jobs of marker (100,000 jobs

nationally), sorter (100,000 jobs nationally), and assembler (150,000 jobs nationally).  (Tr. 22).

As a result, the ALJ concluded that Owens was not disabled under the Act.  (Tr. 23).

### F.   Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (citations omitted).

**G.      Analysis**

In her motion for summary judgment, Owens argues principally that the ALJ's RFC determination is unsupported by substantial evidence due to her failure to properly follow the treating physician rule.  She also argues that the ALJ's determination that she does not meet or medically equal the requirements of Listing 1.04 – Disorders of the spine is not supported by substantial evidence.  While Owens failed to provide evidence to support her claim of disability before 2014, applying her arguments to the period from 2014 forward shows that remand is warranted to determine whether Owens qualifies for a closed period of disability.

*i.      RFC Determination and the Treating Physician Rule*

A claimant's RFC is defined as "the maximum degree to which [she] retains the capacity for sustained performance of the physical-mental requirements of jobs."  20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c).[2] "In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions."  *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed.Appx. 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)).

The treating physician rule "mandate[s] that the ALJ 'will' give a treating source's

---

[2] *See also*, Social Security Ruling 96-8P, 1996 WL 374184 at *1 (Social Security Administration, July 2, 1996) (a claimant's RFC represents her ability to perform "work-related physical and mental activities in a work setting on a regular and continuing basis," defined as "8 hours a day, for 5 days a week, or an equivalent work schedule").

opinion controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1527(c)(2)). "If the ALJ declines to give a treating source's opinion controlling weight, [the ALJ] must then balance the following factors to determine what weight to give it: 'the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)); *see, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) ("Even when inconsistent with other evidence, a treating source's medical opinions remain entitled to deference and must be weighed using the factors provided in 20 C.F.R. §§ 404.1527 and 416.927."). "Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given to a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (quoting 20 C.F.R. § 404.1527(c)(2)). Those reasons "must be 'supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Id.* (quoting Soc. Sec. Rul. ("SSR") 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

Additionally, the law is clear that an RFC is not supported by "substantial evidence" if it is the product of "a selective discussion of the record." *See Brooks v. Comm'r of Soc. Sec.*, 531 F.Appx. 636, 640-41 (6th Cir. 2013). An ALJ does not fairly discharge her duties when she fails to discuss significant contradictory portions of the medical records. *See Minor v. Comm'r of Soc. Sec.*, 2013 WL 264348, at *17 (6th Cir. Jan. 24, 2013); *Roberts v. Colvin*, 2015 WL 181658,

at *10 (E.D. Mich. Jan. 14, 2015) (noting that while ALJ need not discuss all record evidence, "the quality and volume of evidence not discussed by the ALJ may 'raise[] serious doubts about the supportability of the ALJ's RFC finding' and overall conclusions") (quoting *Wilcox v. Comm'r of Soc. Sec.*, 2014 WL 4109921, at *7 (E.D. Mich. Aug.19, 2014)).

In this case, the ALJ gave partial weight to the Physical Assessment opinion of Owens's treating physician, Dr. Kala. (Tr. 24). The ALJ reasoned that Dr. Kala's "opinion that [Owens] can sit, stand, or walk for five or ten minutes ***in an entire eight-hour day is extreme and inconsistent with the objective medical evidence*** showing that ***she has generally demonstrated a normal and steady gait with full motor strength in the lower extremities following her July 2015 lumbar surgery***." (Tr. 24) (emphasis added). The ALJ's analysis is flawed in a few respects.

First, while it is true that Dr. Kala wrote "5-10 min" in response to the Physical Assessment form's question asking her to "indicate the total number of hours [Owens] can sit and stand/walk in an 8-hour workday," reading Dr. Kala's opinion as a whole makes clear that she did not intend such an extreme restriction. (Tr. 396). This is apparent because, in the very next section of Dr. Kala's opinion, she indicated that Owens would need to take unscheduled breaks "every 1-2 hrs" during an 8-hour workday, "depending on activity level," and that each such break would last 15-20 minutes before Owens could return to work. (*Id.*). Obviously, if, as the ALJ found, Dr. Kala believed Owens could only sit, stand, and walk for a *combined* 20 minutes "in an entire 8-hour day," the doctor's answers to these other questions would make no sense; there would be no "activity level" by Owens – certainly none lasting "1-2 hrs" – and there would be no need for any break "before returning to work." Dr. Kala also found that Owens could frequently, *i.e.*, "1/3 – 2/3 of the 8-hour workday" lift and carry up to 10 pounds "in a

competitive work situation." (Tr. 396). Again, this finding would make no sense if Dr. Kala believed Owens could only be upright – whether sitting, standing, or walking – for no more than 20 minutes total in an 8-hour work day.

In sum, it seems clear that the ALJ's analysis of Dr. Kala's opinion is premised on a faulty (albeit literally correct)[3] interpretation that the doctor found Owens could sit, walk, or stand for no more than 20 minutes "in an entire eight hour day," total.[4]

Second, the ALJ's decision to discount Dr. Kala's opinion because Owens had "generally demonstrated a normal and steady gait with full motor strength in the lower extremities following her July 2015 lumbar surgery" is not supported by substantial evidence. (Tr. 24). In support of this finding the ALJ relied on numerous exhibits in the record, such as 2F, 4F, 5F, 10F, 12F, 15F, 16F, and 19F. But many of the records in these exhibits raise serious questions about the ALJ's finding. Most of the records in Exhibit 2F predate Owens's July 2015 surgery, and thus could not bear on her condition after the surgery. It is worth noting, at any rate, that they show that a few weeks before the surgery Owens presented with "substantial left antalgic gait," had positive straight leg raising, and had "difficulty walking." (Tr. 267-68). Exhibit 4F reflects that in December 2015 – a few months after her surgery – Owens reported that her leg and foot "pain was getting worse . . . pain is so severe that she has difficulty wearing shoes[5] and

---

[3] The Court agrees with the ALJ that nothing in the record suggests that Owens needed to essentially lay down for 7 hours and 40 minutes out of every eight-hour period.

[4] The Court has considered whether, because the ALJ determined an RFC that includes a "sit stand option permitting change in position if needed," her misinterpretation of Dr. Kala's opinion is harmless. (Tr. 20). The Court declines to affirm the ALJ's decision on this basis because the ALJ's interpretation appears to have resulted in her discounting other aspects of Dr. Kala's opinion, such as the frequency and duration of breaks Owens would need to take during the work day. At any rate, as discussed below, other issues with the ALJ's handling of Dr. Kala's opinion show that her reasoning is not supported by substantial evidence, and that, at least as to the period from 2014 forward, remand is warranted.

[5] Owens similarly reported pain wearing shoes on October 29, 2015. (Tr. 316).

15

is really unable to ambulate very well . . ." (Tr. 309-10). Dr. Kala noted that Owens "had severe difficulty tolerating the [EMG and nerve conduction study] and was really unable to tolerate it . . ." (Tr. 310). A physical examination revealed "severe pain on palpation of the left Achilles tendon" with numbness and tingling in her foot. (*Id.*). Dr. Kala reviewed an MRI that had been taken just a few days before, and noted that it showed "disk herniation, left foraminal protrusion at the L4-L5 contacting the L4 and L5 nerve root, and that a disc bulge was still present. (*Id.*).

Exhibit 5F is only 11 pages long (Tr. 319-329), with most of the records relating to the time immediately following Owens's surgery when she seemed to be doing better. However, even those records "cautioned that she does have recurrence and [] may have recurrent symptoms as well" (Tr. 320), and just a few months later, in a January 15, 2016 progress note from Owen's surgeon, Dr. Schell, he confirmed that Owens's improvement was short-lived:

> This patient has had a lumbar discectomy. She has had recurrence of the pain with numbness and paresthesias. She did have benefit and relief *initially*. Her imaging studies indicated instrumentation placed at the L5 and S1 levels. She has positive *straight [leg] raising at about 45 [degrees] and sensory changes in an S1 distribution*. She has *trace weakness of the left foot with absent ankle reflexes*.

(Tr. 319) (emphasis added).

Exhibit 12F includes a May 24, 2016 progress note from Dr. Schell, in which the doctor describes Owens as walking "with a mildly antalgic gait." (Tr. 393). Dr. Schell also found that Owens had "decreased range of motion in her back, and positive straight leg raising bilaterally at about 60°." (*Id.*). Dr. Schell went on to state: "I do believe she has a problem with *severe* degenerative disc pathology and some post laminectomy changes at L5-S1, which is likely causing continuing symptoms." (*Id.*) (emphasis added). Exhibit 16F includes a May 16, 2017 progress note from Dr. Schell, who describes Owens as having "gotten worse" after her surgery,

noting "considerable pathologic changes [] at the lumbosacral junction.[6]  She has **severe pain** in the tailbone and buttock area.   This pain does radiate posterolaterally down her lower extremities.   She has numbness in her right leg . . . '**walks with a stooped posture**.'   She has decreased range of motion of her back with associated lumbar muscle spasm.   She has positive straight leg raising bilaterally at about 45°. . . .   she has severe chronic and **intractable** low back pain from **severe** degenerative disc pathology and postlaminectomy instability at the lumbosacral junction.   She has tried and failed physical therapy and injections."  (Tr. 462) (emphasis added).

Lastly, Exhibit 19F contains the documents from the University of Michigan, which show that Owens experienced continued pain and preparation for another surgery.  (Tr. 580-670).   Imaging and other studies showed "degenerative disc disease L4-L5 and L5-S1," and "a **new** central disc bulge" at L5-S1."  (Tr. 590) (emphasis added).

While it will ultimately be up to the ALJ to objectively evaluate the record evidence against Dr. Kala's opinion, when not discounting Dr. Kala's opinion based on a misinterpretation, the ALJ may find that the foregoing evidence supports Dr. Kala's opinion, at least for a closed period of disability commencing in 2014.  Indeed, the foregoing records clearly establish that prior to the July 2015 surgery Owens had a "substantial left antalgic" "abnormal" gait (Tr. 267), and that even after her July 2015 surgery, numerous records belie the ALJ's finding of a "normal and steady gait" (Tr. 24).   On remand, the ALJ should more thoroughly weigh this evidence against the competing records she focused on in her decision.  *Trudell ex. Rel. Bushong v. Apfel*, 130 F. Supp. 2d 891, 895 (E.D. Mich. 2001) ("'Substantiality of the evidence must be based upon the record taken as a whole.  Substantial evidence is not simply some evidence, or even a great deal of evidence.  Rather, the substantiality of evidence must take

---

[6] Dr. Schell noted that Owens' "imaging studies include CT myolographic, several MRI scans, as well as a CT scan."  (Tr. 462).

into account whatever in the record fairly detracts from its weight.'"). *See also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 640-41 (6th Cir. 2013). ("a substantiality of evidence evaluation does not permit a selective reading of the record.").

The ALJ also based her decision to discount Dr. Kala's opinion on Owens's "ability to perform limited housework such as vacuuming, laundry, or dishes and other significant physical activities such as cleaning carpet or sanding cabinets." (Tr. 24). The Court acknowledges that there are isolated records showing Owens having some capacity to sit and perform housework. Notably, though, one of the main pieces of evidence on which the ALJ relies – Owens's attempt to clean her carpet after her surgery in July of 2015 – sent her back to the hospital in severe pain. (Tr. 425-26). The ALJ's brief discussion of Owens's activities also failed to recognize that she only did many of them with significant difficulty or with the help of others, and that she had difficulty with basic activities such as getting dressed, showering, and bathing. (Compare Tr. 24 with Tr. 43-45, 48, 214-16, 222-24).

Nor can the Court say that the ALJ's handling of Dr. Kala's opinion adequately considered the factors outlined in 20 C.F.R. § 404.1527(c)(2). *See Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). While the ALJ recognized Dr. Kala's specialty in neurology, she failed to recognize the lengthy treatment relationship between Dr. Kala and Owens. (Tr. 256-311; 396-500). Moreover, Owens visited Dr. Kala and/or Dr. Hanselman after every MRI and surgical appointment. (*Id*). Most importantly, the record contains objective medical evidence, including voluminous MRIs, CT scans and examinations by Dr. Schell and Dr. Szerlip, that at least arguably appear to support limitations like the ones imposed by Dr. Kala for the period after 2014. For example, in addition to the records discussed above, Owens' December 18, 2015 MRI revealed a "[m]ild to moderate broad-based central protrusion at the L5/S1 level" and "an

18

annular tear at the L4/L5 level" with slight contact of the L4 and L5 nerve roots. (Tr. 312-13). A few days later, Owens' pain in her left Achilles tendon and left foot was getting worse, and she had difficulty wearing shoes and walking. (Tr. 309-11). A few weeks later, in January 2016, Owens "had recurrence of the pain with numbness and paresthesia" as a well as another positive straight leg test and "sensory changes in an S1 distribution." (Tr. 319). A CT myelogram revealed "some mild to moderate disc space narrowing at L5-S1" and "mild disc bulging at L4-L5." (Tr. 381-84). A few months later, Dr. Kala found Owens's motor function at the left lower extremity was diminished and that her reflexes at her left patella and left Achilles were absent. (Tr. 423). Owens also experienced extreme pain upon her straight leg test. (*Id*.). (*See also* Tr. 319-327; 462-489; 580-670). These findings resulted in Owens having another surgery.

For all of these reasons, although Owens presented virtually no evidence to support her claim of disability dating back to 2008, as to the period starting in 2014, the Court cannot say that the ALJ's handling of Dr. Kala's opinion and resulting RFC is supported by substantial evidence. On remand, the ALJ should either re-evaluate Dr. Kala's opinion in light of the foregoing, or at least ask Dr. Kala to clarify her opinion as to the total number of hours Owens can sit, stand, and walk in an 8-hour workday.[7]

    ii.    *Listing 1.04A*

As the Commissioner notes, Owens "does not make a separate argument challenging the

---

[7] The Court notes that the ALJ gave consulting examiner Dr. VanderHaagen's opinion more weight than that of Dr. Kala. (Tr. 24). Dr. VanderHaagen did not have Dr. Kala's treating opinion and/or the many medical records dated after April of 2016 before him when he completed his review of Owens's file. (Tr. 61-74; 256; 396-97). Obviously, Dr. VanderHaagen was unaware of Owens's subsequent 2017 surgery. Given that the Court is recommending remand for the reasons stated above, it would be prudent for the ALJ to either (1) order a new consultative examination so that the examiner may consider the more recent records, or (2) make clear that she considered the timing of the consultative examiner's opinion vis-à-vis the other medical evidence in the record in determining the weight to give that non-examining opinion. *Fisk v. Astrue*, 253 Fed.Appx. 580, 585 (6th Cir. 2007).

ALJ's step-three finding (*See* Pl. Br. at 1, 14), but does assert "[i]nterestingly enough, this gathering of evidence also supports the proposition that Plaintiff met Listing 1.04 for her cervical and thoracic impairments" (Pl. Br. at 17)." (Doc. #16 at 18). In light of the above analysis, the Court need not rule on this issue. However, given the significant evidence discussed above showing that Owens experienced disc compression and contact with nerve roots, limitation of motion of the spine, sensory/reflex loss, and numerous straight leg raising tests, on remand the ALJ should more specifically explain her conclusion as to whether Owens meets *or medically equals* Listing 1.04A – Disorders of the spine, which requires:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

## III.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that the Commissioner's Motion for Summary Judgment (**Doc. #16**) be **DENIED**, Owens's Motion for Summary Judgment (**Doc. #15**) be **GRANTED IN PART** to the extent it seeks remand and **DENIED IN PART** to the extent it seeks an award of benefits, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be **REMANDED** to the ALJ for further proceedings consistent with this Recommendation.

Dated: October 7, 2019                                    s/David R. Grand
Ann Arbor, Michigan                                      DAVID R. GRAND
                                                                      United States Magistrate Judge

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 7, 2019.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
